```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          21 CR 221 (SHS)

SHEINA LEVIN,

                Defendant.              Sentence
------------------------------x

                                        New York, N.Y.
                                        September 27, 2023
                                        2:50 p.m.


Before:


                    HON. SIDNEY H. STEIN,

                                        District Judge

                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  DAVID ABRAMOWICZ
     Assistant United States Attorney

MICHAEL C. FARKAS
GEORGE A. FARKAS
     Attorneys for Defendant


Also Present:
Jeffrey Freeman - NYC Department of Investigation
```

1          (Case called)

2          MR. ABRAMOWICZ:  Good afternoon, your Honor, David

3    Abramowicz for the government.  I am joined at counsel's table

4    by senior investigative auditor Jeffrey Freeman of the New York

5    City Department of Investigation.

6          THE COURT:  Good afternoon.

7          MR. M. FARKAS:  Good afternoon, Michael Farkas, and I

8    am joined at counsel table by the senior partner, my father,

9    George Farkas, as well as Ms. Levin.

10         THE COURT:  Good afternoon.  You may be seated.

11         Let me tell you what information I have.  I have the

12   presentence report prepared on July 31 of this year and revised

13   on August 31, and that contains the addendum and conclusion by

14   the probation department that the appropriate offense level is

15   19, the criminal history category is I.  The guideline range is

16   30 to 37 months.  The recommended sentence by the probation

17   department is 12 months on the basis of a variance.

18         I have the defendant's sentencing submission of the

19   Messrs. Farkas, which is 33 pages, and it requests and it says:

20   Either of the proposed incarceratory sentences.  According to

21   the sentencing proposals set forth on page 32 of 33, the

22   defense is seeking a sentence of probation with continued

23   community service, spiritual counseling, marriage and family

24   therapy and psychotherapy.  And it states alternatively:

25   Should the Court deem a more restrictive component to be

1    necessary, the defense requests a period of home detention

2    under the same conditions and any others deemed appropriate by

3    the Court and the probation department.

4          Attached to the defendant's submission are scores and

5    scores of letters and a submission by the Aleph Institute and

6    a -- I am trying to find the doctor's name -- it's a

7    psychological evaluation -- all of the attachments of the

8    sentencing submission, and I have read them.

9          And, in addition, I have the submission of the

10   government, dated September 13, which is ECF document 81; the

11   PSR is ECF document 79.  And in the government's submission,

12   dated September 13, which, as I say, is ECF document 81, the

13   government submitted that a sentence of probation that includes

14   a period of home confinement would be sufficient but not

15   greater than necessary to serve the legitimate purposes of

16   sentencing.

17         I was actually quite surprised that that was the

18   recommendation of the government.

19         Mr. Farkas, is there any additional written

20   information I should have?

21         MR. M. FARKAS:  No, sir.

22         THE COURT:  Government, is there any written

23   additional information I should have?

24         MR. ABRAMOWICZ:  No, your Honor.

25         THE COURT:  Mr. Farkas, have you and your client read

1    and discussed all of this information?

2            MR. M. FARKAS:  Yes, your Honor.

3            THE COURT:  Do either you or your client have any

4    objections to the findings of fact in the presentence report?

5            MR. M. FARKAS:  No objections.  Just the notes that I

6    have made in my submission.  I think in my submission I pointed

7    out some relatively minor factual differences, such as ages.

8            THE COURT:  Let me ask this.  Let's go through it.  I

9    don't know how many there are, but it seems to me what you are

10   saying is, essentially you don't have any objections to the

11   findings of fact.  If you do, let's hear them.

12           MR. M. FARKAS:  I don't.

13           THE COURT:  Government, do you have any objections --

14   Mr. Farkas, this went both to you and to your client.  You

15   understood that?

16           MR. M. FARKAS:  Yes, your Honor.

17           THE COURT:  Government, any objections to the findings

18   of fact?

19           MR. ABRAMOWICZ:  No, your Honor.

20           THE COURT:  I adopt the findings of fact.

21           Mr. Farkas, in your presentation, if there is anything

22   you want to bring to my attention in that regard, let me know,

23   but I gather you view your objections as not material to the

24   sentencing decision.

25           Is that what you were telling me?

1            MR. M. FARKAS:  I agree, your Honor.  Thank you.

2            THE COURT:  Again, for the record, I adopt the

3    findings of fact in the presentence report.

4            Mr. Farkas, why don't you tell me what it is that you

5    want me to know.  Again, I have read every single one of these

6    letters and all of the information in your submission.  But you

7    can tell me whatever it is you want.

8            MR. M. FARKAS:  With regard to the PSR, your Honor, or

9    with regard to sentencing in general?

10           THE COURT:  With regard to sentencing, anything you

11   want me to know, including what's in the PSR, if you want to

12   respond to that.

13           MR. M. FARKAS:  I guess, just on a technical level,

14   with regard to the PSR, I will note that in the government's

15   submission, they do consent to having the applicable guideline

16   range reduced to a level 17 with an applicable range of 24 to

17   30.

18           THE COURT:  Let me respond to that because that's

19   worthwhile.

20           MR. M. FARKAS:  Yes, your Honor.

21           THE COURT:  The 4C1.1 change hasn't taken effect.  It

22   takes effect on November 1.  I am perfectly prepared to

23   sentence this defendant as if it was 17 and I, with a guideline

24   range of 24 to 30 months, as opposed to what the presentence

25   report has found, which is 19 and I and a guideline range of 30

1    to 37.

2          But because this is prior to November 1, my intention

3    at this point, subject to what you are going to tell me, is

4    that the offense level will be 19, the criminal history

5    category will be I, the guideline range will be 30 to 37, but

6    my sentence is going to be the same, regardless of whether it

7    was 19 and I or 17 and I.

8          Are we on the same wavelength?

9          MR. M. FARKAS:  100 percent, your Honor.

10          THE COURT:  Government, you're with me?

11          MR. ABRAMOWICZ:  Yes, your Honor.

12          THE COURT:  Proceed.

13          MR. M. FARKAS:  Thank you, your Honor.

14          THE COURT:  Just to guide you, I was surprised at the

15    government.  It was a more lenient recommendation than I

16    thought the government would recommend.  Given that the parties

17    are pretty close to each other, if not absolutely congruent, I

18    don't think that I am going to deviate in any material respect

19    from that, so that should give you serious -- hear what I have

20    to say.  Go ahead.

21          MR. M. FARKAS:  Your Honor, certain senior counsel who

22    might be sitting at the table taught me, as a young attorney to

23    quit while he's ahead.

24          THE COURT:  I think that's appropriate.

25          MR. M. FARKAS:  If your Honor --

1          THE COURT:  I don't want to mislead you.  It's not

2    going to be exactly what the parties are asking for.

3          MR. M. FARKAS:  That's quite all right.  I have

4    nothing to say that has not been articulated in my very

5    extensive submission.  As you can see, I took great care to put

6    everything I had into the submission.  I'll dare say that it is

7    more lengthy and extensive than most of my submissions have

8    ever been, and that's not to devalue any of my other client's

9    cases.

10         Just, this was a very compelling and moving case for

11   me personally, as well as professionally, worthy of meeting Ms.

12   Levin and seeing how she approached this case from the day she

13   walked into my office, seeing how Aleph embraced her, seeing

14   what she has done ever since.  It has been extraordinary in

15   every sense of the word.

16         I don't have anything to add that your Honor hasn't

17   already very faithfully considered in my submission.  I was

18   going to highlight some points, but again, I'm quitting while

19   I'm ahead.

20         Rabbi Brysky from Aleph is here today to discuss not

21   only his impressions of Ms. Levin and her efforts since they

22   began working with her, but also the details of his alternate

23   sentencing proposal, which again have been laid out in my

24   submission, but he obviously has a more personal perspective to

25   share about that.

 1            I can appreciate that your Honor is considering a

 2   sentence that while it may be similar to what the government

 3   and I are proposing, that you may have other concerns and

 4   ideas, so to speak.  We are available to answer questions that

 5   you might have with regard to that.

 6            But I think what we are seeking is pretty clear, and

 7   we have tried to present you with a comprehensive proposal to

 8   ensure all of the purposes and tenets of sentencing.

 9            THE COURT:  If you want Mr. Brysky to speak, I

10   certainly will listen to him, but I certainly am not going to

11   outsource supervision to a private organization.

12            MR. M. FARKAS:  Right.  I am glad you mentioned that,

13   your Honor, because one of the things I wanted to mention was

14   that I didn't mean to suggest that.

15            THE COURT:  That's exactly what you are requesting,

16   because you want the two proposed institutions to be what the

17   Aleph Institute has suggested, and indeed you say, under

18   supervision.  I don't know if you used that word.  But that's

19   exactly what you are asking me to do.

20            MR. M. FARKAS:  From my perspective, your Honor, call

21   this perhaps a bit more of a state court perspective, when

22   someone is on probation as being supervised by the probation

23   department, they are going to choose certain providers for

24   therapy, for community service, for what have you.

25            Our proposal is that at least to include these

1     extensive proposals in probation's overview and supervision so

2     that the community service that she would be performing, which

3     she is actually currently performing and is committed to

4     continue performing, for example, through Aleph would continue

5     under the supervision of not only Aleph but the probation

6     department, in addition to whatever conditions that your Honor

7     and probation may feel are additionally necessary.

8              THE COURT:  I do note that her volunteer work with

9     those two organizations commenced at or about the time of the

10    plea, is that correct?

11             MR. M. FARKAS:  Those are the most recent, your Honor,

12    yes.  She has continued -- there are so many efforts, it's hard

13    to list them.

14             THE COURT:  She has had a life of a great deal of

15    service to her community, no question about that.  The

16    references to the two service positions that she has held under

17    the aegis of Aleph were at or shortly after the time of her

18    plea.

19             MR. M. FARKAS:  That is correct, your Honor.  After

20    getting to know her and forming a proposal and a paradigm that

21    would be, in everyone's opinion at Aleph, most appropriate for

22    her, this is what was constructed and that is where that came

23    from.

24             THE COURT:  If you want somebody else to speak to me,

25    go ahead.

1          MR. M. FARKAS:  I'd like to introduce Rabbi Yossi

2     Brysky, who is the chair of the alternate sentencing for Aleph.

3          MR. BRYSKY:  Good afternoon, your Honor.

4          THE COURT:  Good afternoon, sir.  Welcome.

5          MR. BRYSKY:  Thank you.

6          I may look like some of Sheina's relatives here in

7     court, but I help many others who don't look like me or

8     practice the same faith as me.

9          THE COURT:  That may be true, sir.  I have no reason

10    to doubt it.  But I can tell you that in my years of

11    experience, to my recollection, Aleph has never made a

12    recommendation for any defendant, except those who are Orthodox

13    Jews.

14         MR. BRYSKY:  Your Honor, that is probably very

15    close -- that is probably how it works here in New York.  I

16    zigzag the country advocating for individuals all over the

17    country that are -- as long as they are ready to sign up for

18    our program.  It happens to be that a lot of the people here in

19    New York do know about me.

20         I lived in Crown Heights, Brooklyn for 23 years.  I

21    never met Ms. Levin before in my life.  When I found out, when

22    she told me that she had pled guilty, that's when we step in,

23    as long as they are pleading guilty with sincere remorse and

24    they are ready to enter our program.  We have had defendants

25    who would say they would rather go to prison for a couple of

 1  months than follow through with our intense program.

 2          THE COURT:  Even when they do go to prison, I normally

 3  have a request from the defense, I think it's to be put in the

 4  prison in the area of the Bureau of Prisons that encompasses

 5  Florida, because I think you have some programming down there,

 6  if I'm not mistaken.

 7          MR. BRYSKY:  That's correct.  We have a headquarters

 8  in California and Brooklyn as well.

 9          When people call, we are not the go-to organization

10  for anyone who is enmeshed in the criminal justice system.  If

11  someone calls me and, says here is my story but I'm absolutely

12  innocent, I recommend they get a very good lawyer.  If they

13  tell me they pled guilty because as a matter of convenience

14  they don't to want to go to trial, costs too much, I will tell

15  them to get a very smooth-talking lawyer for sentencing.

16          If someone calls, like Sheina did, and her voice is

17  cracking when she is talking about the victims and she is

18  reading her psych report that we asked her to do, she is

19  reading the mitigation narrative that we asked her to help

20  draft, then she is looking at herself in the mirror and she is

21  recognizing that this is something that she needs to work on.

22  She needs to step it up.  She studies classes with me on a

23  weekly basis.  We study teachings based on Maimonides and going

24  beyond the letter of the law.

25          All I'm asking from this Court is that, of course, as

1    counsel mentioned, probation is meant to supervise all of her

2    activities as the Court decides, but ultimately we do work with

3    probation on the specifics of -- if probation would like to

4    work with us, we try to meet with the chief whenever we can in

5    various districts.  Ultimately we are working with them to make

6    sure those hours are meaningful hours, which she already is

7    doing, and we are simply asking the Court that the Court not

8    interrupt this process that is rehabilitative and benefiting

9    society.

10          Your Honor, thank you very much for allowing me to

11   address the Court.

12          THE COURT:  Thank you, sir.  I appreciate your coming

13   here to tell me what you do.

14          Mr. Farkas, is there anything else you wish to say?

15          MR. M. FARKAS:  No, your Honor.  Subject to your

16   questions, that is my presentation.

17          THE COURT:  Thank you.

18          Let me hear from the government.

19          MR. ABRAMOWICZ:  Thank you, your Honor.

20          We too will largely rest on our submission, although I

21   do want to respond to -- your Honor is surprised at our

22   sentencing recommendation.  I'd like to emphasize that it's not

23   a recommendation we came to lightly.  It certainly was a very

24   close call, given the nature of the offense here.  This is a

25   serious offense.  It obviously harms the organization involved,

 1    BPHN.  It harmed essential services for people in need.

 2              THE COURT:  It harmed everybody because inevitably, as

 3    a result of this crime, what people do is, they lose confidence

 4    in the ability of the government, specifically the City of New

 5    York, to administer programs that help the poor and

 6    underprivileged.  So she has undercut her own mission.

 7              MR. ABRAMOWICZ:  That's exactly right, your Honor.

 8              THE COURT:  This crime has ripple effects.

 9              MR. ABRAMOWICZ:  It certainly does and it does

10    undermine public trust, and we see --

11              THE COURT:  In fact -- go ahead.  I'm sorry.

12              MR. ABRAMOWICZ:  And we see that it's not an isolated

13    problem.  It's a problem that has plagued New York City for

14    years and it's a problem that, as your Honor knows --

15              THE COURT:  It's not limited to Mr. Rivera here.

16              MR. ABRAMOWICZ:  Exactly.  It's not limited to

17    Mr. Rivera and Ms. Levin.  It's a problem that others have

18    fallen into as well.  We understand that, and we take that very

19    seriously.

20              The offense is serious.  There is a need for general

21    deterrence, given the number of especially private contractors

22    and businesses involved in providing these services and the

23    amount of money there is to be had.  And there certainly needs

24    to be an understanding out there that back-room deals involving

25    corruption won't be tolerated, and we think we have shown our

1   view on that with this prosecution and others, including before

2   your Honor.

3          To explain our recommendation a little bit, we did

4   feel that the mitigating factors here were extremely strong and

5   unusual, beyond the scope of what we usually see.

6          I just want to emphasize the ones I'm focused on.

7   This was an early plea, in our view.  It was before indictment.

8   It was before any discovery was produced or requested.  It did

9   follow what we consider a sincere effort to cooperate by Ms.

10  Levin, although we did not extend a cooperation agreement to

11  Ms. Levin, and we are not making 5K1.1 requests for a

12  departure.

13         THE COURT:  My sentence is not going to be based on a

14  departure.  It's going to be based on a variance.

15         MR. ABRAMOWICZ:  Exactly, your Honor.

16         We are not making that request because we ultimately

17  did not require the substantial substance, but I will

18  acknowledge that her efforts to cooperate were sincere, and we

19  credited what she told us.

20         Finally, there is a financial component here.

21         THE COURT:  As I understand it, the agreed upon

22  restitution will be paid rather quickly from the escrowed

23  funds, which are more than the agreed-upon restitution.

24         Am I correct in that?

25         MR. ABRAMOWICZ:  Yes, I believe they are more, and it

1    is our position that they will be and should be paid promptly.

2              THE COURT:  I am going to direct that they be paid

3    promptly.

4              MR. ABRAMOWICZ:  It's significant, in our view, that

5    it is Ms. Levin who is paying it, even though she is jointly

6    and severally liable with the person we considered to be more

7    culpable of the coconspirators, which is Victor Rivera.

8              THE COURT:  I agree.  In the scheme of this

9    indictment, he is more culpable, that's correct.

10             MR. ABRAMOWICZ:  Those are the factors driving our

11   recommendation here.

12             I do want to note that I share your Honor's –– what I

13   detected are concerns with the prospect of any sort of

14   outsourcing of the supervision or of any probation.  So it's

15   certainly our view that the Court should not deviate from its

16   typical practices and its typical reliance on the probation

17   office.

18             THE COURT:  Mr. Brysky has put my concerns to rest

19   there.

20             MR. ABRAMOWICZ:  Good.

21             With that, I think that's all I have, your Honor,

22   unless you have any questions.

23             THE COURT:  Thank you.  No.

24             Ms. Levin, you have the right to speak to me.  You

25   don't have to say anything at all.  And I do need to tell you

1    that anything you say may be used against you, but I'm here to

2    listen to anything you want to tell me.

3           I am going to ask that you rise out of respect for the

4    institution, if you are able.

5           MR. M. FARKAS:  Your Honor, if Ms. Levin may, she has

6    prepared remarks to be written down.  She is nervous.  It would

7    help her --

8           THE COURT:  Of course.  You can read it.  I just need

9    you to tell me -- of course your lawyer could certainly help

10   you with those remarks.  I just need you to tell me that

11   everything you are about to tell me is true.

12          THE DEFENDANT:  Yes, it is.

13          THE COURT:  Please.  I'm here to listen to anything

14   you want to say.

15          THE DEFENDANT:  Your Honor --

16          THE COURT:  Take your time.  It's difficult, I'm sure.

17          THE DEFENDANT:  Thank you.  I appreciate that.

18          Thank you for giving me this opportunity to speak.

19   Just two days ago was Yom Kippur, the holiest day of the year

20   on the Jewish calendar, a day of complete atonement before God.

21          As wholly and as solemn as that day is, my own

22   personal Yom Kippur began well before March 9, 2023, when I

23   came before you publicly acknowledging my wrongdoing.

24          It began back in February of 2021, when I was first

25   contacted by Mr. Abramowicz and faced a reckoning unlike

1    anything I had ever experienced in my life.

2          I started on the day to beg God, the government, and

3    anyone I may have hurt so deeply for forgiveness and a second

4    chance.  To try to earn that kind of deference, I have

5    attempted to show who I truly am, and pour every ounce of

6    effort into doing just that.

7          For two and a half years leading up to this day I have

8    one immense self-reflection.  I have spent this time in prayer

9    and meditation, trying not only to understand how I came to

10   this point, but on owning my actions and taking responsibility

11   for them.  It has been a time of deep introspection, listening

12   and learning.  I ask myself constantly, what does God envision

13   for me?  How do I grow through this devastating experience?

14   How do I reconnect with the voice inside of me that knows the

15   difference between right and wrong?

16         Growing up as a little girl, all I dreamed about was

17   making the world -- this world a better place, and I put my

18   whole heart into doing that.  Giving of myself, being involved

19   in my community, and helping anyone in need comes as second

20   nature to me.  My parents taught me first and then my children

21   continue to teach me to love the person standing in front of

22   me, to be a listening ear, to care, to put people's welfare

23   first, to open my home and my heart to those in need.

24         When I reflect on my crime and how I got here, I

25   become physically ill.  I don't recognize myself.  I have

1    shattered myself and everyone around me.  My body trembles at

2    the thought of possibly not being able to care for my elderly

3    parents, my husband, my children, my grandchildren, and all

4    those who depend on me.

5         My time reflecting on all of this horror, however, has

6    brought out something deep inside of me that will be with me

7    forever.  I am the better person for it.

8         I know that my attorneys have presented a lot of

9    information to you demonstrating who I truly am.  My passion is

10   contributing to society in any way I can.  I live to help

11   others.  I have messed up really badly, and I will spend the

12   rest of my life atoning for this.  I take full responsibility

13   for my criminal behavior -- for the criminal behavior I have

14   committed.  Not a day will go by where I won't use this dark

15   time and immense pain that I have caused to deter others from

16   straying as I did.  I plead from the bottom of my heart to

17   allow me to stay on the straight and narrow path of caring for

18   my family, my parents and continuing my life in the most humble

19   and ethical of ways.

20        With immense gratitude for your compassion, again, I

21   thank you, your Honor.

22        THE COURT:  Thank you.

23        Let me ask this, Ms. Levin.  Some people don't have an

24   answer.  I don't want you to make up an answer.  But if you

25   engaged in reflection, why did you do this?

1          You can talk to your attorney.

2          What led you to do this?

3          THE DEFENDANT:  There were a lot of things that led up

4    to the relationship.  It started out as a normal business

5    relationship.  And I saw Mr. Rivera as somebody who was 30

6    years in recovery, in sobriety, really working with people,

7    and, by nature, a very trusting person.  And it went from

8    regular business to a situation where -- from a for profit to

9    the not for profit.  I don't even think I realized how it was

10   changing until it did.

11         THE COURT:  The kickbacks were described as consulting

12   fees, so you knew full well that when you are getting money

13   back to him, it wasn't on the up and up.  And I know you were

14   very successful in the real estate business, so I assume you

15   were a sophisticated business woman.

16         THE DEFENDANT:  I was paying him from my pocket.

17         THE COURT:  No, no.  You were paying him from the

18   Bronx Parents Housing group's pocket.

19         I want you to address me.

20         THE DEFENDANT:  I didn't understand that's what I was

21   doing.  My -- the difference between the lease and the sublease

22   was the profit that I was -- was the money that I was making

23   and, I didn't understand that it might have been money that

24   could have gone or should have gone to BPHN because the numbers

25   that I negotiated --

1          THE COURT:  Then why did you put it down as consulting

2     fees?

3          THE DEFENDANT:  I don't know.  There was no logical --

4          THE COURT:  I want you to talk to me.

5          THE DEFENDANT:  I understood by that point that I

6     wasn't allowed to pay him.  And this was his -- I don't even

7     know how to answer it.

8          THE COURT:  I take it you see that as a major mistake.

9          THE DEFENDANT:  Yes, I do.  As a major -- I have told

10    my children many, many times and anybody I see, sometimes you

11    think that -- you are not sure if what you are doing is right

12    or wrong.  The second you feel that it's wrong, you need to

13    stop.  You need to listen to that part of you that says no.

14    Don't let someone convince you that it's fine.

15         And I will regret it for the rest of my life.  And the

16    possible pain that I can cause my parents is killing me, and I

17    would never -- this is truly against my nature and my

18    personality, and I got caught up in something that I didn't

19    quite understand at the time and then I understood.

20         I am very, very sorry and remorseful for anything that

21    I did, anything that I have done.  I have spent my life and my

22    career helping people.

23         THE COURT:  I think that's true, and I think you are

24    very remorseful, and all of these letters are a testament to

25    your efforts throughout the years to help your community and

1      others, no question about that.

2              THE DEFENDANT:  What I do for a living is, I help the

3      community that doesn't have a voice.  This is what I do.  I'm

4      in real estate, and I could have easily gone to the

5      gentrification of real estate, and I didn't.  My heart didn't

6      let me.  I became known in the industry as, oh, yeah, she does

7      programs.  That was who I am.  I'm the one you go to if you

8      want your apartments rented to programs, if you want to work

9      with nonprofit organizations.  That's what I do.  And I love

10     doing it.  I love helping.

11              I met a guy on the street the other day, a young boy

12     from our community who was definitely -- I don't know if

13     tomorrow he will be alive.  I said, whoa, I can't just leave

14     him in the street.  I bought him lunch, and I sent him to the

15     shelter.  I spoke to SUS, who is Services for the Underserved

16     and I said, I'm sending him in an Uber to you.  Please let me

17     know when he gets there, and we need to arrange for services

18     for him, or he won't survive.

19              This is what I do.  I wasn't doing anything that was

20     unusual for me.  So when I see organizations doing that, I was

21     very excited and very happy to be a part of it.  That's who I

22     really am.  That's who I want to be.  I'm very grateful that

23     God let's me do that to make a living.

24              THE COURT:  I don't mean to break you at all, but the

25     fact of the matter is, in the course of your doing that, you

1    committed a serious crime by depriving the Bronx Parent Housing

2    Network of $800,000 that otherwise would have gone to them, or

3    if you don't view it that way, as simply you were illegally

4    kicking back to Rivera $800,000.

5            THE DEFENDANT:  That's what I thought.  That's what I

6    realized I was doing.  It wasn't money that would have gone

7    back to Bronx Parent Housing Network.  It wasn't money that

8    they would have gotten.

9            THE COURT:  Thank you.

10           MR. M. FARKAS:  Your Honor, would you mind if I

11   elaborated on that last point?

12           THE COURT:  Go ahead.  It is money they would have

13   gotten if it were an arm's length negotiation that Rivera had

14   not put his thumb on and not found a willing cooperator in

15   connection with the conspiracy and Ms. Levin.

16           MR. M. FARKAS:  100 percent, your Honor.  This is the

17   one small area.

18           THE COURT:  You say 100 percent.  Make sure Ms. Levin

19   understands that because she seems to think that it was coming

20   out of her pocket.

21           MR. M. FARKAS:  That is how she perceived it at the

22   time, your Honor.  That is what Ms. Levin perceived at the

23   time.  I don't think it's unusual for someone in her position

24   years ago to have proceeded that way mistakenly.  It does not

25   detract from the knowing wrongfulness of the act.  If your

1    Honor --

2         THE COURT:  Again, I certainly don't mean to berate

3    her, and she has done an enormous amount of good in her life,

4    and I have every reason to believe will continue to do so,

5    serving her community and others on a constant basis -- I have

6    read all the letters -- opening her home throughout the world,

7    constantly assisting them in a variety of ways, welcoming and

8    supporting scores and scores, probably hundreds of people,

9    having an open home for meals and for people to sleep in.  I

10   was wondering how she could do that with "only" five bedrooms,

11   but one of the letters says they slept on the floor.  That made

12   more sense when I read that.

13        But there is no question about her remorse and there

14   is no question about her early cooperation with the government.

15   The government has already spoken to that.  But I'm not sure

16   she really understands the ripple effects of the loss of

17   confidence in the antipoverty programs that her participation

18   is subject to.

19        MR. M. FARKAS:  There is no doubt, your Honor.  It's

20   funny because this is the exact point that Mr. Abramowicz and I

21   started speaking about the moment we met and brought us all

22   through the government's recommendations.  This has probably

23   been the subject of more discussion than any other point, at

24   the time she committed the wrongdoing, knowingly paying

25   Mr. Rivera, when it was wrong and illegal to do so.  There is

1   no doubt that she -- that's why she pleaded guilty, because she

2   was paying kickbacks that she knew she was not allowed to pay.

3          THE COURT:  And, quote, hiding them all, although it's

4   not very well hidden as consulting fees.

5          MR. M. FARKAS:  Because she knows that they couldn't

6   be direct payments to him for anything else because it's not

7   legal.

8          The question of appreciating how this was taking money

9   out of -- even theoretically or practically out of BPHN's

10  coffers and therefore the city's coffers is not a point that

11  she appreciated at the beginning of this process or certainly

12  when she committed the act, because her lay, logical thinking

13  was, the city is paying a fair, in fact a very competitively

14  fair market value rate.

15         THE COURT:  I am surprised the contract apparently

16  wasn't changed.

17         MR. M. FARKAS:  That is a major point that I made in

18  the submission.

19         THE COURT:  I think that probably goes to negligent

20  oversight by the city, but I understand how you are using it.

21         MR. M. FARKAS:  I did anticipate you saying that.  The

22  civil attorney who negotiated that, at very, very difficult

23  effort with the city, he is actually sitting in the courtroom

24  today to back me up in case I say something that doesn't make

25  any sense.  But this was so heavily discussed and fought over

1   intellectually with the city, it's not negligent oversight,

2   your Honor.

3          The bottom line is that the city obtained, like it had

4   hundreds and hundreds of times before and since, a proper rate

5   to house this homeless population in these buildings.

6          If Ms. Levin had decided to act legally and say no to

7   Victor Rivera when he said where is my cut, then the exact same

8   conditions and terms would be continuing to this day, and BPHN

9   would never receive any part of Ms. Levin's end, so to speak,

10  from the contract.  It was her illegal act of paying him THE

11  kickbacks that now even created this theoretical deprivation to

12  BPHN of these hundreds of thousands of dollars.  Because had

13  this contract proceeded legally, had Victor Rivera never said,

14  give me my end, and Ms. Levin said yes, no other money would be

15  going to BPHN.

16         So in her mind at the time, paying him out of her end,

17  I think is understandable that she wouldn't appreciate how that

18  has now deprived BPHN and the city of something.  Of course we

19  know, as attorneys and jurists, that that is correct.  She has

20  come to appreciate that now.

21         But in answering your Honor's question about whether

22  she appreciated it at the time, I thought she was very honest.

23  She didn't.  She didn't get it.  It has taken a lot of soul

24  searching and a lot of legal explanations to explain what that

25  impact is, as well as the broader, perhaps the most important

 1    impact, and that is on the integrity and the public's trust of

 2    the system, be it not for profit or for profit.

 3            My discussions with Mr. Abramowicz focused on and

 4    began and ended with this point.  He will tell you, in our

 5    first meetings he was like, what are you talking about?  It's

 6    obviously their money.

 7            THE COURT:  Their being BPHN.

 8            MR. M. FARKAS:  BPHN, right.

 9            The contract should have been reduced by half, or

10    whatever the percentage is.

11            And although he isn't saying something differently

12    completely now, I think we all agree that the contract had --

13    has never been and will never be half.  It was simply

14    Mr. Rivera acting illegally that deprived that organization of,

15    even theoretically, more money, and now, of course, Ms. Levin

16    understands that.

17            And I don't think enough can be said about how she

18    handled the dispute with the city and BPHN that really

19    demonstrates who she is, your Honor.  I made this point too,

20    but I don't know if it really came through.  Ms. Levin --

21            THE COURT:  It did.  The monies are in escrow.  I

22    understand that.

23            MR. M. FARKAS:  It goes well beyond that.  What she

24    did was great.  She is a criminal defendant.  She is facing a

25    criminal case.  It's a good thing to get money in escrow to pay

1    the restitution.  It will look good for her at sentencing.

2    That's the common, let's just call it strip-down reality.

3          But in this case it's not.  Because had she handled

4    that dispute with BPHN without any legal basis whatsoever,

5    unilaterally decided to stop paying the rent two years ago and

6    then first they did and then the city said, you, no illegal

7    basis whatsoever, stopped paying the rent, but still expected

8    the hundreds of people we are housing in these buildings to be

9    cared for as if the contract is in full effect, when that

10   happened, Ms. Levin had a lot more options than what she

11   availed herself of.  She could have started and ended the

12   entire dispute adding millions and millions of dollars of

13   arrears and late fees and penalties to what that settlement had

14   be to.  She could have terminated the lease immediately and

15   forced the city's hand.  She didn't do any of those things

16   because she knew that by doing any of that, it would increase

17   the amount of money that the city would have to pay to service

18   this homeless population, and she did not want that, and that's

19   why she took over a million dollars out of her pocket to pay

20   the landlord while BPHN and New York City sat on the payments

21   for no legal reason whatsoever.

22         Mr. Buss, who is in the audience today, was begging

23   me, let me start an Article 78.  Let me bring up some kind of

24   mandamus action against the city.  They can't do this.  But

25   that's not what Ms. Levin wanted.  She kept the contract going.

1    She kept the lease in effect out of her own pocket.

2              And, finally, the settlement was reached weeks ago,

3    where not only was only the base amount of rent arrears paid,

4    no penalties or interest of any kind, but the contract is now

5    continuing for the rest of its life, the amount of years, and

6    by now it's a far-below-market contract rate for these

7    services.

8              I think it's important that your Honor understand that

9    nobody would have begrudged her if she had gone for more money,

10   but she didn't want to do that, and we could have had more

11   money for forfeiture today from this settlement if we wanted,

12   but we didn't think it was right.

13             Subject to your questions, your Honor, I think that

14   kind of beats the horse dead.

15             THE COURT:  Thank you.

16             Ms. Levin, if you will rise.

17             Before I formally impose sentence, Mr. Farkas, did you

18   wish to lodge any objections to sentencing?

19             MR. M. FARKAS:  No, your Honor.

20             THE COURT:  Mr. Abramowicz.

21             MR. ABRAMOWICZ:  No, your Honor.

22             THE COURT:  I hereby find that the total offense level

23   is 19.  The criminal history category is I.  The guideline

24   range is 30 to 37 months.

25             Pursuant to the Sentencing Reform Act of 1984, it is

1   the judgment of this Court that the defendant, Sheina Levin, is

2   hereby sentenced to time served.  In addition to time served,

3   she shall be placed on supervised release for a period of two

4   years with the conditions recommended by the probation

5   department, namely, the mandatory conditions set forth on page

6   32 of the presentence report plus the standard conditions 1

7   through 12 set forth on pages 32 and 33 of the presentence

8   report.

9            In regard to the mandatory conditions, I am suspending

10  the mandatory drug testing requirement.  She shall refrain from

11  any unlawful use of a controlled substance, but I am suspending

12  the requirement to submit to one drug test within 15 days of

13  release and at least two periodic drug tests thereafter.

14           Within 72 hours of the entry of the judgment in this

15  case, Ms. Levin shall report in person to the probation office

16  in the Southern District of New York.

17           In addition to the standard and mandatory conditions,

18  I am imposing the special conditions that are set forth on

19  pages 33 of the presentence report.

20           Special condition 1 is providing the probation officer

21  with access to all requested financial information.

22           Special condition number 2 is participation in an

23  outpatient mental health treatment program approved by the

24  probation office which shall include psychotherapy.

25           Special condition number 3 is that she shall not incur

1   new credit charges or open additional lines of credit without

2   the approval of her probation officer.

3           I am adding special condition number 4.  Special

4   condition number 4 is that she shall serve nine months on home

5   detention where she is restricted to her residence at all times

6   except for employment, education, religious services, medical,

7   substance abuse, or other mental health treatment, attorney

8   visits, court appearances, court-ordered obligations, or any

9   other activity preapproved by her probation officer.  The home

10  detention condition for nine months shall include -- I'm sorry.

11  The way to phrase that is, the first year of supervised release

12  shall include 20 hours of work per week for the first year in

13  programs to be approved by her probation officer.

14          The recommendation of the Court is to accept the

15  recommendations of the Aleph Institute for 10 hours per week of

16  volunteer work with the Urban Outreach Center in its location

17  on First Avenue in Manhattan, and 10 hours per week of work for

18  Housing Plus in its efforts to place women in permanent housing

19  in the Trinity Church location or out of the Trinity Church

20  location.  That is 20 hours a week of community service for the

21  first year of supervision.

22          Defense, is it clear?  Let me make sure everybody

23  understands.  Two years of supervised release of which nine

24  months is on home detention and the first year of which is 20

25  hours of volunteer work per week for nine months with the

1   recommendation of the Court for placement, as I say, at the

2   Urban Outreach Center and Housing Plus.  But that's subject to

3   approval by the probation department.

4           MR. M. FARKAS:  Just so I understand, your Honor, any

5   other activities reviewed and approved by the probation

6   department on home detention --

7           THE COURT:  Absolutely.  Including, as I say,

8   employment, so she can go about her job.

9           MR. M. FARKAS:  We will review care responsibilities

10   with the probation department.

11           THE COURT:  Yes, exactly.

12           MR. M. FARKAS:  Thank you, sir.

13           THE COURT:  I am not imposing a fine because I find

14   Ms. Levin lacks the ability to pay a fine after taking into

15   account the presentence report and her family responsibilities.

16   I am imposing restitution, and I am signing the order of

17   restitution here.  Let me read it.

18           I take it has been consented to, is that correct, sir?

19           MR. M. FARKAS:  Yes, your Honor.

20           THE COURT:  It provides for restitution in the total

21   amount of $838,808.78 to the victim, which is the Bronx Parent

22   Housing Network, Inc.  It's joint and several with victim

23   Rivera in 21 CR 221.  The payment instructions are in the order

24   that I'm signing.  I have signed that order.

25           I am going to direct that restitution be paid within

1   15 days of the entry of the judgment because I understand that

2   there is already an escrow, $814,013, that's owed to Ms.

3   Levin's company and is in escrow, plus she is holding in escrow

4   an additional $265,000.  By my calculation, that's more than

5   the $838,880.78 that is the restitution order.  So I'm

6   directing that restitution be fully paid by this defendant

7   within 15 days of the entry of the judgment.

8            Has a preliminary order of forfeiture been entered,

9   Mr. Farkas?

10            MR. M. FARKAS:  Yes, it has.

11            THE COURT:  Government, Mr. Abramowicz.

12            MR. ABRAMOWICZ:  Yes, your Honor.

13            THE COURT:  It's in the sum of $790,835.06?

14            MR. ABRAMOWICZ:  Yes, your Honor.

15            THE COURT:  I am imposing that forfeiture order, and

16   upon entry of the judgment my understanding is that the

17   preliminary order becomes a final order.

18            I hereby order Ms. Levin to pay to the United States a

19   special assessment of $100, which is due immediately.  My

20   sentence would be the same even if the guidelines were offense

21   level of 78, criminal history category I, and a guideline range

22   of 24 to 30.

23            This is a substantial variance, Ms. Levin.  I am sure

24   Mr. Farkas and perhaps Mr. Abramowicz will explain that to you.

25   I think the substantial variance is appropriate, in light of

1   your lifelong charitable efforts, the fact that this is your

2   first felony, first crime, your sincere attempts to cooperate,

3   your early acceptance of responsibility, and I do think it's

4   quite appropriate.

5          Mr. Farkas, do you know of any legal reason why this

6   sentence should not be imposed as I have stated it?

7          MR. M. FARKASP:  No, your Honor.

8          THE COURT:  Mr. Abramowicz.

9          MR. ABRAMOWICZ:  If I could just clarify one thing,

10  your Honor.

11         THE COURT:  Yes.

12         MR. ABRAMOWICZ:  Because we have seen some complaints

13  in other cases about community service requirements, it seems

14  to me that the community service requirement here is completely

15  appropriate, in part because it was actually requested by the

16  defense as an alternative to other components of sentencing,

17  and therefore there cannot be any error that can be complained

18  of later by the defense.  If we could just put that on the

19  record.

20         THE COURT:  What do you want me to put on the record?

21         MR. ABRAMOWICZ:  I suppose just ask the defense

22  whether there is any objection to the community service

23  component.

24         THE COURT:  Let me make it lucid.

25         Home detention is for nine months.  Supervised release

1    is for two years.  For the first year she is to perform 20

2    hours a week of community service.  I have recommended two

3    programs that in turn were recommended by the defense.  They

4    are not to be supervised by Aleph.  It's to be supervised by

5    the probation department.  Aleph is to have no role in it.

6    It's between the court, probation office for the Southern

7    District of New York, and the defendant.  Is that clear, sir?

8            MR. ABRAMOWICZ:  Yes, your Honor, I think it's clear.

9    I just wanted to clarify that the defense has no objection just

10   to the quantity.

11           THE COURT:  Does the defense have any objection to

12   that ruling?

13           MR. M. FARKAS:  It does not, your Honor.  Perhaps I

14   should just ask for clarification.  I don't want Aleph to have

15   any supervisory responsibility, but I believe that they will

16   probably be able to inform the probation department with the

17   nature of the programs if probation wants that information.

18           THE COURT:  The probation department can ask anybody

19   about anything it wants.

20           MR. M. FARKAS:  Very well.

21           MR. ABRAMOWICZ:  Nothing else from the government.

22           THE COURT:  I hereby order the sentence to be imposed

23   as I have stated it.

24           Government, is there a limited waiver of appeal rights

25   in the plea, and is it 37 and below?

1            MR. ABRAMOWICZ:  Yes, your Honor.

2            THE COURT:  Ms. Levin, you have the right to appeal

3    the sentence I have just imposed on you.  If you cannot pay the

4    cost of an appeal, you have the right to apply for leave to

5    appeal *in forma pauperis*.  I do wish to inform you that in your

6    plea agreement you agreed to waive the right to appeal the

7    sentence, and you agreed to waive the right to collaterally

8    attack the sentence if I sentenced you to 37 months or fewer

9    months.  In fact I have sentenced you to time served, so it's

10   very much below 37 months.

11           If you make a request, the Clerk of Court will prepare

12   and file a notice of appeal on your behalf immediately.

13           Do you understand your appeal rights?

14           THE DEFENDANT:  Yes, I do.

15           THE COURT:  Mr. Farkas, if Ms. Levin wishes to appeal,

16   all she has to do is tell you that.  In any event, I instruct

17   you to file a notice on her behalf.

18           Do you understand, sir?

19           MR. M. FARKAS:  Yes, your Honor.

20           THE COURT:  Any open counts or underlying instruments?

21           MR. ABRAMOWICZ:  No, your Honor.

22           THE COURT:  Ms. Levin, I don't think I need to tell

23   you anything.  You've had an admirable life of service.  I

24   expect that will continue.  I think you do understand the

25   nature of the crime.  I don't want to belittle it.  It's

1   substantial and it does impact people's faith in governmental

2   services.

3           You clearly have the support of your community.  For

4   the record, there are a substantial number of people in this

5   courtroom.  And, again, all of those letters, scores and scores

6   of letters were quite laudatory.  You will be OK.  I have no

7   doubt I won't see you here again.

8           Good luck to you.  Thank you.

9           (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25